UNITED STATES DISTRICT COURT     17-cv-06871-ENV-SJB
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------X
RASHAUN FERGUSON,

                 Plaintiff,


     -against-


THE CITY OF NEW YORK, et al,
                 Defendants.


-------------------------------------------------------X

### PLAINTIFF'S MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT




Fred Lichtmacher
The Law Office of Fred Lichtmacher P.C.
Attorneys for Plaintiff

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................................1

PROCEDURAL POSTURE ............................................................................................... 4

STATEMENT OF RELEVANT FACTS ........................................................................... 5
      POLICE OFFICER VARGAS .................................................................5
      HENRY MCCUMMINGS ..................................................................... 7
      PRINCIPAL LOGAN-SMITH .............................................................8
      DEFENDANT DETECTIVE QUINN JAEGER ...................................11
      DETECTIVE MICHAEL GILDEA ......................................................12
      ORRIS WHEELING ..............................................................................16
      MARCUS ORTIZ ..................................................................................18
      REGINALD EVANS ..............................................................................19
      WYNTER CARTER ..............................................................................20

SUMMARY JUDGEMENT STANDARD ...................................................................... .21
      PROBABLE CAUSE ............................................................................21
      MALICIOUS PROSECUTION ............................................................22
      DENIAL OF A FAIR TRIAL ...............................................................23
      QUALIFIED IMMUNITY ....................................................................25

CONCLUSION ...............................................................................................................25

<u>TABLE OF AUTHORITIES</u>

**CASES**

<u>Boyd v. City of N.Y.</u>, 336 F.3d 72, 75 (2d Cir. 2003))...............................................................22

<u>Coleman v City of NY</u>, 688 F App'x 56, 57 [2d Cir 2017]........................................................22

<u>Doninger v. Niehoff</u>, 642 F.3d 334, 344 (2d Cir. 2011).............................................................21

<u>Fappiano v. City of New York</u>, 640 F. App'x 115, 118 (2d Cir. 2016) ....................................24

<u>Garnett v. Undercover Officer C0039</u>, No. 1:13-CV-7083 (GHW), 2015 U.S. Dist. LEXIS 45232, 2015 WL 1539044, at *4 (S.D.N.Y. Apr. 6, 2015)....................................................................24

<u>Jeanty v City of Utica</u>, 2021 US Dist LEXIS 7737, at *44-45 [NDNY Jan. 14, 2021, No. 6:16-cv-00966 (BKS/TWD)]) ..........................................................................................................24

<u>Jones v Treubig</u>, 963 F3d 214, 224-225 [2d Cir 2020].............................................................25

<u>Jovanovic v. City of N.Y.</u>, 486 F. App'x 149, 152 (2d Cir. 2012)..............................................24

<u>Lowth v. Town of Cheektowaga</u>, 82 F.3d 563, 571 (2d Cir. 1996)............................................22

<u>Manganiello v. City of N.Y.</u>, 612 F.3d 149, 161 (2d Cir. 2010).................................................22

<u>Olaizola v Foley</u>, 797 F App'x 623, 624 [2d Cir 2020]............................................................21

<u>Perez v. Duran</u>, 962 F. Supp. 2d 533, 543 (S.D.N.Y. 2013.......................................................24

<u>Poventud v. City of New York</u>, 750 F.3d 121, 132 n.12 (2d Cir. 2014) ....................................24

<u>Rentas v Ruffin</u>, 816 F3d 214, 221-222 [2d Cir 2016])............................................................23

<u>Stephenson v. Doe</u>, 332 F.3d 68, 81 (2d Cir. 2003)...................................................................25

<u>United States v. Rivas,</u> 377 F.3d 195, 199 (2d Cir. 2004)..........................................................24

<u>Warren v. Dwyer</u>, 906 F.2d 70, 76 (2d Cir. 1990)....................................................................25

<u>Ying Li v. City of New York</u>, 15-CV-1599(PKC), 246 F.Supp.3d 578, 626-28 (E.D.N.Y. 2017) ......................................................................................................................................................24

ii.

# INTRODUCTION

On May 3, 2013 at 8:08 p.m. in the courtyard in front of 54-30  Beach Channel Drive, in Far Rockaway, New York, two men were shot by a lone shooter. One of the men, Keith Gulley, was pronounced dead shortly thereafter. The other, Reginald Evans, survived.

With no witnesses identifying him, with the surviving victim giving a description of a light skinned man, with the Preliminary Investigation Worksheet generated less than seven hours after the shooting describing a 5'9" man wearing dark clothing, and with the first eyewitness interviewed describing someone light skinned and 5'9", all of which defendants Quinn Jaeger and Michael Gildea knew, nevertheless hours after the shootings, the defendants made Rashaun Ferguson, a darkly complected man over six feet tall, their primary suspect. As the first lead detective on the case, Michael Gildea, led a corrupt investigation, in which exonerating evidence was allowed to be destroyed; was not documented in DD5's; an exonerating witness was not disclosed; a description of a light skinned shooter by the victim was not memorialized in a DD5; pressure tactics were used on at least two witnesses; a lie was promulgated about the car used as the escape vehicle; and a coverup was undertaken about the existence and relevance of an exculpatory surveillance video and the unimpeachable witness who viewed it.

Honorable Charles S. Lopresto while presiding over the criminal trial hearings commented on the failure of the District Attorney to produce the surveillance video or related DD5's. Critically, the defendants and their colleagues in the NYPD, failed to report and sought to hide the fact that there was an unimpeachable exonerating witness.

The fact that victim Reggie Evans immediately after the shooting, described a "light skinned" shooter is contained only in a faded, barely legible note made by Defendant Quinn Jaeger. (Exh. "8"

-1-

Jaeger notes). The statement was taken by Jaeger directly after the incident as Mr. Evans while probably in great pain, was being placed in an ambulance. (Exh "9" Jaeger at 47:21-48:5).

After Ferguson's investigator found the exonerating witness, defendants actively sought to minimize the value of her evidence. The Principal of the Goldie Maple Academy, a/k/a PS/MS 333, is Ms. Angela Logan-Smith. Ms. Logan-Smith viewed the escaping shooter on a surveillance camera with two unidentified members of the NYPD[1] probably on May 6, 2013. The video, exonerating evidence which defendants allowed to be destroyed, depicted the suspect running from the scene, and a sedan driving away from the shooting. Defendants failed to preserve or document its existence or the viewing of the video in a DD5. The names of the officers who viewed the video with Ms. Logan-Smith were never disclosed. (Lichtmacher Declaration). The video showed that the fleeing felon was not wearing the khaki pants Mr. Evans testified to the grand jury he was wearing. The video showed the escape route depicted in a diagram drawn by Detective Gildea with input from Orris Wheeling. (Exh. "10 Gildea dep at 22:4-14 (Exhibit 3 from dep, herein Exh "20)).

The defendants fabricated out of whole cloth the "fact" that the murderer fled in a Ford Escape. This bogus information was used to connect, by the thinnest of threads, Mr. Ferguson to the crimes, as his mother was among the 200,000 odd Americans who also owned a Ford Escape at that time. (Arnoldy Declaration). Mr. Ferguson often drove that vehicle. (Exh "11" Ferguson dep at78:8-21; at 79.). Ferguson, a young African American male, does not even remember how many times he has been pulled over while driving. (Exh "11" at 34:5-7). Members of the NYPD knew he drove a

---

[1]    There is testimony from Gildea that Jaeger viewed the video. However, Ms. Logan-Smith wrote the two officers' names down and placed them in her drawer at school. When the pandemic hit she was unable to access her drawer. Pursuant to the Magistrate Judge's ruling we subpoenaed Ms. Logan-Smith and she will be searching for the document upon her return to her school.

Ford Escape. And Gildea knew and disliked Ferguson since at least 2004 when Rashaun was just ten years old. (Exh "11" at 158).

On September 12, 2017 during the first day of criminal trial hearings held before the Honorable Charles S. Lopresto, the Court ordered ADA Regan to look into three issues in order to "fill in the blanks" with respect to the people's evidence, including the missing surveillance camera footage and the corresponding missing DD5s. But the Office of the Queens District Attorney could not produce that evidence. The NYPD had neither preserved nor documented viewing of the video nor the names of the people who viewed it in a DD5. (Exh "12" Tr Trans D00557). A short time thereafter Judge Lopresto stated to Ferguson's criminal attorney, Robert Didio[2] "well, they give you a lot of ammunition for your defense. That's all I can say." (Exh "12" at D00571). Judge Lopresto's words are just as appropriately applied to this civil matter as they were in the criminal trial.

We will never know the full extent of what could have come from the production of that video. But the fabrications told by the defendants, who either saw it themselves or had it viewed by their colleagues, indicates they feared what it would do to their criminal case against Ferguson. In any event, Ferguson was illegally deprived of this evidence and that the deprivation was intentional is revealed by the coverup that followed. As the video depicted the actual fleeing felon it is likely had it been disclosed Ferguson would never have been arrested or indicted.

Gildea, whose coercive behavior in the underlying criminal case includes ripping up a little girl's dolls, has known and exhibited aggression towards Rashaun Ferguson since 2004, **when plaintiff was only ten years old**. (Exh "11" at158). From the beginning of the investigation, Gildea,

---

[2]      Robert DiDio Rashaun Ferguson's attorney in the criminal case and my good friend passed away unexpectedly on January 9, 2021 at the age of 60.  This is why Plaintiff was unable to obtain his Declaration.

with the help of his partner Jaeger, worked to pin the shooting on Ferguson. Evidence which pointed away from Ferguson was either suppressed, allowed to be destroyed, or not documented, and witnesses who did not confirm the defendants' version of events were pressured to provide false testimony or were not disclosed. Mr. Ferguson's arrest resulted in an innocent man spending three years and nine months in jail.

## PROCEDURAL POSTURE

On January 27, 2014 the plaintiff was arrested and a Felony Complaint was sworn to by Jaeger. (Exh "1" Felony Complaint). Subsequently Mr. Ferguson was indicted and charged with PL 125.25-1 Murder in the Second Degree (1); PL 110/125.25-1 Attempted Murder in the Second Degree (2); PL 265.03-3 Criminal Possession of a Weapon in the Second Degree (3); PL 265.03-lB Criminal Possession of a Weapon in the Second Degree (4); PL 120.05-2 Assault in the Second Degree (5); and PL 260.10-1 Endangering the Welfare of a Child (6). (Exh "2" Indictment).The criminal trial began on September 20, 2017 and concluded on On October 16, 2017, with a verdict acquitting plaintiff on all counts. (Exh "16" Certificate of Disposition). Ferguson was incarcerated throughout the entire process. (Lichtmacher Declaration).

Ferguson filed a notice of claim against the City of New York on October 17, 2013 including a claim for common law malicious prosecution against the City of New York. (Exh "3" Notice of Claim). Plaintiff subsequently filed his federal complaint on November 22, 2017 in the Eastern District of New York and was assigned index # 17-6871. The complaint names The City of New York, Detective Jaeger, Detective Gildea, and Unidentified Members of the NYPD as defendants. Plaintiff's claims are brought for malicious prosecution and denial of a fair trial pursuant to 42 U.S.C. § 1983 against both Jaeger and Gildea, and malicious prosecution pursuant to the common

law of the State of New York against the City of New York. (Exh "4" Federal Complaint). Discovery has been completed and all defendants have moved for summary judgment as to all three of plaintiff's claims. Due to overwhelming evidence of the defendants' liability, primarily by suppressing, altering, failing to document and allowing to be destroyed exculpatory evidence, defendants' motion must be denied in its entirety.

## STATEMENT OF RELEVANT FACTS

Mr. Ferguson relies in part on his Responses to Defendants' Statement of Allegedly Uncontested Facts, his cross Statement of Uncontested Facts and for the Court's ease of reference, provides necessary evidence in the text of this memorandum.

Quite literally the only alleged "fact" used to immediately connect Mr. Ferguson to the crimes, was the fabrication that the getaway car was a Dark Gray Ford Escape. That "fact" was not a "fact" at all, and the defendants were aware of this.

The shooting was first reported at 8:08 pm (Exh "5" Sprint Rep D000052). At 8:18 pm an anonymous officer puts over the radio the car is a Dark Gray Ford Escape. (Exh "5" D000062).

**Police Officer Vargas**

Police Officer Alfonso Vargas, who is not a named defendant, spent seven years working in the 101st precinct. (Exh "6" Vargas dep at 12:3-6). On May 3, 2013 Officer Vargas was working out of the satellite from the Housing Authority for the 101st. (Exh "6" at 19:24-20:4). On that date a call came over the radio about a shooting near 54-30 Beach Channel Drive. (21:7-11). The entry in his memo book regarding shots fired indicates a time of 8:30 pm. (46:16-25; Exh "7" Vargas Memo Book). Initially, Vargas was not going to respond as he was not assigned to patrol that day, but his Sergeant asked him to go to help out. (Exh. "6" at 22:4-13).

Vargas walked to the scene and turned right onto Beach 56th Street facing north across from the Goldie Maple Academy. (22:25-25:3). On the way to 54-30 Beach Channel Drive he encountered Orris Wheeling and his family. (27:11-17). The encounter occurred approximately a quarter of a block away from the scene of the shooting. (30:5-8). Wheeling told Vargas that he was an eyewitness to relevant events. According to Vargas, Wheeling "said he saw a dark gray Ford Escape, people rushed to it and it was heading westbound towards the 100th Precinct." (34:4-7). Vargas memo book says Dark Gray Ford Escape at or after 8:35. (Exh "7"). However, the Sprint call about the Dark Gray Ford Escape came over the air at 8:18, which means Vargas should have heard that report over his radio, which he acknowledges he had with him. (Exh "5" D000062; Exh. "6" at 39:18-20). Vargas had his watch with him. (50:16-17). He does not remember if he put the information the vehicle was a Ford Escape over the air, but he says he passed the information along. (Exh "6" at 34:8-12).

Although encountering an eyewitness to a double shooting Vargas alleges he only remembers Wheeling giving him the make and model of the vehicle and nothing about a physical description of the shooter was memorialized. (35:9-14; 34:8-19; Exh "7").

Vargas agrees that one of the important things to note about an alleged perp is his height. (85:18-21). Another is his weight. (85:22-25). Race could be an important thing to make note of. (86:2-5). Hair style is important as well. (86:17-19). But even though he spoke to Wheeling for some reason he didn't record any descriptive information about the fleeing shooter, he only memorializes Wheeling supposedly reported the vehicle was a Dark Gray Ford Escape. Vargas admits it's a high priority to put over the radio all information about a fleeing felon as soon as he receives it. (39:13-17).

Vargas generated the Complaint Report in the criminal case. (Exh "6" at 54:17-19). In the

Complaint Report it indicates there were no working cameras in the area. (62:11-19; Exh "17" Complaint Report). The document also indicates there are no witnesses.

**Henry McCummings**

Henry McCummings lives in Far Rockaway. (Exh "18" McCummings dep at 3:10-12). In May of 2013 the 101st Precinct cops picked Mr. McCummings up, handcuffed him in front of his neighbors, and brought him to the 101st detective squad to speak to detectives about a murder. (Exh "18" at 6:24-7:16; 8:22- 9:7). He was told a detective wanted him. (7:20-8:20). Once at the squad he was told he was an accessory to a murder with a Ford Escape. (9:9-21). He was spoken to by Detective Gildea. (10:18-25). Gildea told him witnesses had identified him as the driver of the getaway vehicle which was not true. (11:25-12:8). Gildea told him they knew he was the getaway driver. (14:17-25). During this first encounter with Gildea he was shown photographs of Ferguson, the murder victim, and of two others and he did not know any of them. (21:8-22; 22:9-13). McCummings was picked up around 9:30 am and was let out around 4 or 5 pm. On the way out of the precinct Gildea told him he knew he had something to do with it and that he was going to be watching him. He said this in front of Mr. McCummings' wife. (27:9-19).

At the beginning of the "interview" McCummings was asked if he knew Ferguson. (26:5-11). He was accused of lying when he said he did not. (25:25-26:4). He was being pressured to make an identification. (25:6-8). The cops showed him a photo, which Gildea told him was a photo of the shooter, and Gildea also said that he, McCummings, was the driver. (61:17- 62:17). At the Detective squad he was not allowed to use the bathroom, the officers refused his requests for water, and he was in handcuffs the entire time. (20:6-25:15). He informed the officers that the handcuffs were too tight and they refused to loosen them. (Exh "18" at 36:7-13). McCummings feels that he was not allowed

-7-

to go to the bathroom for approximately seven (7) hours, because he wouldn't admit to being involved in a crime. (Exh "18" at 34:20-24). Gildea was trying to pressure Mr. McCummings into saying things that were not true. (Exh "18" at 91:11-16).

After that day Gildea led raids on his home two times and found nothing. (Exh "18" at 15:11-17). The first "raid" of his apartment was approximately one month after they grabbed him initially. (30:16-22). On that occasion Mr. McCummings had called an ambulance for his wife who had pneumonia and the police showed up, raided his house looking for guns, tore up his home and arrested him and his wife because his wife's belt allegedly looked like brass knuckles and he spent five days in jail. (15:18-17:19). McCummings lost his job over the incident. (17:15-17). Despite the cops coming when an ambulance was summoned for his wife, she was arrested also. (at 68-69). McCummings' wife was not able to get medical treatment until after she was released. (69: 13-18).

Gildea led another raid on Mr. McCummings' home pointing guns in his and his seven year old son's faces, looking for guns and drugs and again found nothing but arrested him anyway. (Exh "18" at 17:20-20:5). During that raid on his house the cops ripped up his daughter's dolls and various items in his home were broken. (73: 20-25). McCummings asked to see a warrant and was never shown one. (73:7-13). On yet another occasion Gildea searched McCummings on the street in front of his children without searching anyone else and said he wanted guns. (67:13-68:18). In Mr. McCummings opinion, the police have no respect for the people in his community. (33:20-25). The population of Far Rockaway is primarily African American. (Lichtmacher Declaration).

On September 12, 2017 during trial preliminaries Honorable Charles S. Lopresto, ordered the DA to look into the McCummings issue. (Exh "12" D00557). Mr. McCummings was never prosecuted for being the alleged driver and clearly a trail of lies were concocted to pressure him to

-8-

testify falsely he was the driver and Ferguson was the shooter.

The police actions against Mr. McCummings, his home and his family, terrorized his children, who now grab onto their father every time they see police. (92:23-93:3).

**Principal Logan-Smith**

Principal Angela Logan-Smith testified at trial and gave a deposition. Her testimony is relevant for three points.  First, in a stark contradiction to what Gildea testified to, Ms. Logan-Smith testified there were no obstruction to the view from the camera which two plane clothes NYPD officers viewed in her office. Secondly, the officers made no effort to preserve the video. And third, there was no Ford Escape driving down the exact block Gildea indicates it would be going down on the diagram he drew.

Angela Lynnette Logan-Smith at the time of the criminal trial had been the principal at the Goldie Maple School for fourteen years. (Exh "12" at D01870-1). The Goldie Maple School is located at 365 Beach 56th Street, Arverne, New York 11692. (Lichtmacher Declaration) The School abuts Beach 56th Street. (Exh "12" at D01873). That location is just south of Beach Channel Drive. (Lichtmacher Declaration). Camera 16 shows a view from the school to Beach 56th Street just south of Beach Channel Drive. (D01873). This is the street which Gildea's diagram indicates the shooter ran south down. (Exh "20" the Diagram).

On May 6 2013 Ms. Logan-Smith met with and spoke with some members of law enforcement at the School during which time she showed them the footage from Camera 16. (Exh "12" at D01874). The officers were shown the footage on a big T.V. in her office. The officers provided her with the date and time and she played the surveillance video for them. ( D01875). There were two officers who she showed the footage to, in which you could see a man running by and a

few seconds later a car drove by. (D01876). There was one person running on the video. (D01878: 5-11). The view from Camera 16 started at about 100 feet from Beach Channel Drive. (D01879). There were no obstructions to that camera angle. (D01880:5-7). There was no scaffolding up blocking the view from that camera. (D01880:8-10). There was no fencing or trailers, or anything that blocked the view of Beach 56th Street where one could see the man running and the vehicle driving. (D01880:11-14). There were no obstructions at all. (D01880:5-7;15-16). The officers viewed the tape with her. (D01880:17-19). The officers neither took a copy nor did they request to have a copy. (D01880:22-D01881:2). The officers told her they would get back to her if they needed anything else, but they never got back to her (D01881:2-13). No DD5 was generated about the viewing and Ms. Logan Smith, an eyewitness to the shooter running away, was never disclosed to Mr. Ferguson's defense team.  (Lichtmacher Declaration).

Principal Logan-Smith viewed the surveillance video and reported seeing a sedan, not an SUV. (Exh "19" Logan Smith dep at 16:13-14, 15:15-19). Gildea has asserted that two large generators and scaffolding obstructed the view from the camera. (Exh "10" at 47:16-23). But Principal Logan-Smith has testified there were no obstructions, and no generators, or scaffolding blocked the view of Beach 56th Street from the surveillance camera. (Exh "19" at 29:8-15).

Ms. Logan-Smith testified as to the viewing of the video at her deposition:

Q. The officers, they watched the video
with you how many times?
A. Twice.
(Exh "19" at 16:21-24)

Ms. Logan-Smith made clear the vehicle visible in the video was a sedan, not an SUV:

Q. Let's talk about the car. Was it a
sedan, SUV, a sport car something else?
A. Sedan.

-10-

Q. Are you certain?
A. Yes.
(Exh "19" at 15:15-19).

Critically, at trial Ms. Logan-Smith described the man she saw running as wearing dark clothes. (Exh "12" at 1876:21-22). Had the video been secured and utilized, stop frames could have been used to see the runner. The images could have been blown up or otherwise enhanced. A license plate may have been able to be deciphered from the car, and a clearer view obtained of the pants which were clearly not the khaki pants described by Mr. Evans. And if the fleeing man had tattoos, as did Mr. Ortiz, that could well have been dispositive to the determination that Ferguson was not the fleeing felon. (Exh "14 Ortiz Mugshot; Exh 15 Ferguson Mugshot).  Ferguson was denied all those possible benefits from the evidence.

**Defendant Detective Quinn Jaeger**

Jaeger did not testify at the criminal trial. (Lichtmacher Declaration). Jaeger, on the date of his deposition had a clear memory of the investigation into Keith Gulley's death. (Exh "9" Jaeger dep at 8:21- 9:2). He was involved in the investigation but Gildea was the lead detective. (Exh "9" at 9:8-14). On October 2, 2013 Jaeger became the new case detective on the case. (10:18-23).  Jaeger alleges he has no memory of finding out there was a video from the school. (13:9-14).  Contrary to what Gildea said, Jaeger testified he never went to the school to view the video. (13:15-19; Gildea Tr Test; Exh "12" at D1801: 5-17). Jaeger claims he never discussed watching the video with Gildea. (13:22-24). Jaeger, alleges he does not know if anyone watched video footage with the school's Principal. (13:15-21; 14:18-22).

However, Jaeger agrees it would be important to the investigation to view any possible videos which faced Beach 56th Street. (14:7-13). Jaeger answered the following question in the

-11-

following manner:

> Q      Is it fair to say that the existence of the video facing Beach 56th Street might be an important document in this investigation?
>
> A      Yes

(Exh "9" at15:10-15).

Jaeger justifies that testimony stating the surveillance camera was blocked. (15:19-25).  He also alleges he saw construction on the site. (16:2-19).

Jaeger testified that Wheeling was never a suspect in this incident. (22:15-17). Jaeger testified that when putting together the series of DD5's it is important that any officer who reviews the file can see what was done before he got involved and that the purpose of keeping these DD5's is to keep a running history of investigative steps. (14:23-15:9). Jaeger also states you should write the information received on a DD5 fairly soon after the incident.  (29:6-11).

Jaeger, the lead detective beginning  on October 2, 2013 somehow doesn't know of any steps that were taken to either prove or disprove that McCummings was the driver. (35:19-25). McCummings was never prosecuted for the crime. (36:19-22). Alhough Jaeger knew there was surveillance cameras around McCumings' building, he knows of no officers having reviewed such footage. (36:2-18). No DD5's regarding such an action exist. (Lichtmacher, Declaration).

**Detective Michael Gildea**

Michael Gildea was the initial case investigator for the shootings. (Exh "10" Gildea dep at 20:25-21:5). When Gildea was case investigator, his partner was Jaeger. (26:14-18). Gildea and Jaeger are personal friends. (27:16-18). Gildea is a third grade detective. First grade is the highest rank for detectives, followed by second grade and then third grade. (11:4-10).

Gildea testified at the criminal trial.  He alleged on the night of the incident shortly after 8pm

-12-

he was in the 101ˢᵗ detective Squad, monitoring the radio. (Exh "12" Tr Trans at D01782:7-19). A transmission came over about shots fired at 54-30 Beach Channel Drive. **(**D01782: 24-D01783:3). He and partner Detective Jaeger took notepads and went to the location. (D01783:12-16). Despite acknowledging he brought his notepad Gildea alleges when he spoke with Wheeling, he took no notes. (Exh "10" at 101:23-102:9).

Gildea alleges he developed a suspect as a result of that preliminary investigation, Rashaun Ferguson. (Exh "12" at D01784:3-7). By May 4, 2013 at 2:30 am he had already constructed a photo array, in which he alleges Orris Wheeling identified Ferguson. The photo array was generated barely 6 hours after the shootings, premised on the anonymous report at 8:18 pm of a Ford Escape. (Exh "5" at D0062) About a day or two after the shooting Gildea asked other members of the NYPD to locate and apprehend Ferguson. (D01785:2-21). Ferguson was then arrested in the confines of the 107ᵗʰ Precinct. (D01786-7).

At his deposition Gildea identified "a map that I drew with the information provided to me by a witness who observed the shooting and identified the shooter." (Exh "10" Gildea dep at 22:4-11; Exh "20" Diagram). In response to the question "Is it true that Orris Wheeling never told you the SUV was a Ford Escape?" Gildea responded, "I believe, if I remember correctly, Orris Wheeling confirmed it was a Ford Escape being he didn't know the exact model, the style, the way it looked and the color." (Exh "10" at 102:25-103:6).

The DD5 Gildea generated allegedly memorializing his and Jaeger's meeting with Wheeling on May 3, 2013, for some reason, was not generated until June 15, 2013 and it is reviewed by a supervisor on June 17, 2013. (Exh "10" at 49:5-25, Exh "22" DA's DD5's #4). This despite the fact that the work performed was conducted on May 3, 2013. (Exh "10" at 50:2-6). The delay was

-13-

allegedly casued by other pressing matters needing to be addressed. (50:7-10).

DD5 #4 (Exh "22") describes Wheeling telling Gildea that while working on his own car he saw a man exit a vehicle on Beach 56th Street. The man was then called back by the driver and he removed his shoes and walked towards Edgemere.  After which Wheeling heard shots fired and saw the man running back to the vehicle with a gun in his hand. The shooter got into the vehicle which sped away down Beach 56th Street towards Seagirt. (Exh "22"). According to Gildea, Wheeling told him the vehicle he saw was a Grey Ford SUV later identified as an Escape. Wheeling denied saying this when speaking to both Investigator DeLeon and later to ADA Regan. (Exh "21" DeLeon Report; Exh "23" ADA Regan dep at 13:14 - 14:10). Gildea states that he and Wheeling drew the diagram together. (Exh "10" at 53:15-19). But Gildea admits that the only writing on the diagram that is not his own is Wheeling's signature, which Wheeling informs was placed on the diagram before it was entirely filled out. (54: 8-11, 15-23; Exh "21"; Exh "20" the Diagram).

Gildea was questioned about surveillance videos at the Preliminay Hearings in this matter and gave the following responses to the following questions.

Q    Were you involved in any way in either the identification or the recovery of any video surveillance footage regarding this case?
A    No, sir.
Q    Are you aware now that you have reviewed all of the materials whether there is any surveillance video in regards to 19 this case?
A    There was no surveillance video in regards to this case, sir.
Q    Do you know whether there was video surveillance that was retrieved by police that was discarded or lost or misplaced in any way?
A    up until the time where I was assigned this case and 1 reassigned to a new unit, there was no surveillance footage of any sort in regards to --
Q    Since that time have you learned of any video surveillance of any type?
A    No, sir.
     (Exh "12" at D000234:13-D000235:5)

Another alleged "fact" Gildea wrote in the DD5 from the Wheeling interview was that

-14-

Wheeling identified the driver as Henry McCummings, something which Wheeling and McCummings deny. (Exh "21"). Based on Gildea's fabrication regarding McCummings, Gildea severely harassed McCummings on multiple occasions but never caused charges to be brought against him for participating in the shooting. Despite the alleged identification of McCummings by Wheeling and McCummings detailing how he and his family were severely harassed repeatedly by Gildea, Gildea alleges he doesn't recall ever speaking to him. (Exh "10" at 56:24-57:2). This is difficult to reconclie in light of Gildea alleging he had enough information based on Wheeling's statement to connect McCummings to the crime. (61:18-21) Gildea reports the DA declined to prosecute McCummings. (61:22-25). Even though he was lead detective in this matter, he believes McCummings was brought to the detective squad but he never spoke with him.  (58:2-6).

On the Photo Array Viewing Report shown to Gildea at his deposition, when was asked who wrote "That is the guy w/ the gun;" Gildea testified that it is Wheeling's handwriting. (68:10-13; Exh "24" Photo Array Viewing Report). But Jaeger, Gildea's partner, testified it looks like Gildea's handwriting on that same statement.  (Exh "9" at 42:17-22; Exh. "21"; Exh "24"  Photo; Array Viewing Report (marked as exhibit 7 at Jaeger's dep)).

Gildea does not remember ever speaking with the principal of the Goldie Maple Academy where the surveillance video was filmed. (Exh "10" at 39:4-6). He testified at this deposition that in relation to the crime location due to the placement of the cameras they would not be of value. (39:17-23). Which is curious because the Diagram he acknowledges drawing, with the help of Wheeling, has the shooter escaping directly past that location. (Exh "20"). Logan-Smith testified "I showed them the footage that is focused on Beach 56th Street."(Exh "19" Logan Smith at 14:10-13).

Gildea, contradicting what Jaeger testified to, told the prosecutor that Jaeger viewed the

surveillance footage. ( Exh "12" at D01798:8-25).

Gildea left the detective squad in August of 2013 and the case was transferred to his partner Jaeger. (Exh "12" at D01790:6-17). Jaeger, who became lead detective on the case on October 2, 2013, doesn't know of any steps that were taken to either prove or disprove that McCummings was the driver. (Exh "9" at 35:19-25).

**Eyewitness Orris Wheeling**

Eyewitness Orris Wheeling did not testify at any of the criminal proceedings. (Lichtmacher Declaration). Wheeling was interviewed and gave details about what he saw to Private Investigator retired First Grade Detective Elpidio DeLeon. Mr. Wheeling testified in the civil case on two occasions. However he had a federal criminal case, initiated by Gildea's former partner, Christopher Velsor, and his attorney had him plead the fifth to most questions. (Exh "25" Search Warrant Affidavit). Plaintiff fought against Mr. Wheeling pleading the fifth and the Magistrate Judge ruled against us. (Docket Entry # 65). He pled the fifth despite the fact that Jaeger has testified that Wheeling was not a suspect (Exh "9" at 22:15-17). One question I posed to Mr. Wheeling which he was allowed to answer was if he had spoken truthfully to Investigator DeLeon and he testified he had. (Exh "26" Wheeling Dec. 12, 2018 dep at 13:10-12).

Mr. DeLeon interviewed Mr. Wheeling on August 4, 2017 before the start of the criminal trial. His statement to Mr. DeLeon contradicted most of what Gildea wrote, as he alleged to be providing information Wheeling had supplied supplied to him, and raises serious concerns about defendants' veracity in this matter. Further, Wheeling's statement confirms much of Principal Logan-Smith's testimony, Wynter Carter's testimony, the information on the Preliminary Investigation Report generated by the NYPD Sergeant, the initial description of the shooter by victim

-16-

Regginald Evans and confirms that the man who killed Keith Gully and wounded Reggie Evans, was Marcus Ortiz. Mr. Ortiz, now murdered himself, was identified by Mr. Wheeling. Ironically, Marcus Ortiz' name, was in the detective's file yet they did not interview him or view him as a suspect. This is questionable because he was the height described by Wheeling, Carter and the Preliminary Investigation Report and the build witnesses described and he was light skinned as Regginald Evans initially described the shooter. Ortiz looked nothing like Rashaun Ferguson. (Exh "14" Exh "15"). Mr. DeLeon reduced much of the statement to a writing which Mr. DeLeon signed himelf and which he did not ask Mr. Wheeling to sign. (Exh "21"; DeLeon Declaration). Mr. Wheeling's account of the incident and his alleged statements to Defendant Gildea differ in several important regards:

> On Friday 8/4/201 at 10:30 hrs, I spoke with Orris Wheeling on the 2nd floor of 5505 Beach Channel Drive Arverne, NY. I showed Mr. Wheeling DD5 follow up #4 dated 6/15/2013 as reported by Dt3 Michael Gildea: He said he described the SUV as being similar to a jeep and silver gray in color. He said the SUV seemed to be a 1997 or 1998. He said what stood out about the SUV was that the catalytic converter made a lot of noise. Orris said he never told the detective the SUV was a Ford Escape. Orris said the detectives showed him a photo of a man and asked him if he had ever seen this man driving a Ford SUV. Orris told the detectives he had seen that man in a Ford SUV before in the area. Orris said the detectives had him sign the photo. I showed Orris the photo and he said the writing under the photo "This is man the one who was the driver. I do see him all the time" was not written on the paper before he signed it and that was not his writing. Orris told me he did not know the man in the photo by name. Orris said the detectives asked him to describe the passenger who exited the SUV. He told me he described the man as a light skin male, 5'9" tall, slim, about 160 lbs. I showed Orris a sketch of the crime scene, where they said he was parked and where the SUV had parked. He said the diagram was wrong, Orris then wanted to go outside. He showed me where the car was parked with the hood up. He said his wife was in the driver's seat. He was parked more in the middle of the block, on Beach 56th Street, under a lamp post and the SUV had parked across the street close to the entrance to PS/MS 333. Orris said the detectives wanted him to identify the man he saw with the gun,
> They showed him a photo array. He said he did not recognize anyone. Orris said he told the detective that the men in the array were too dark. He

said the detective told him that witnesses were saying it was number 1 and he had to pick him. Orris said to me that since people were saying it was number 1 it must be him, so he signed his name under the number 1 photo. Orris said he later viewed a line up at the 101 detective squad.  He said he asked the detectives to have the guy in positions number 5 stand up but that was not him. When Orris came our to fht elineup he said the detective told the guy number 4 was too dark and too heavy.  Orris said he had a Fed case pending and they were trying to cut him a deal to cooperate in this murder case. He was undecided with what he wanted to do. Orris told me that the word on the street was that Marcus Ortiz had shot the two guys. I then showed Orris two single color photos of Marcus Ortiz I had on my cellphone. Orris said that was the man he saw exit the SUV and take his shoes off. The man with the gun. Orris said he is afraid for his family and did not want to get involved. I told Orris Marcus had been killed outside of New York. I told Orris the man arrested in this case is Rashaun Ferguson, Orris said the detective wanted him to identify Ferguson but he wouldn't do it. Orris said he would be willing to help Ferguson out but was afraid for his family, and unsure about his fed deal.  (Exh "21" DeLeon Report)

On May 7, 2013 at 12:01 a.m., the plaintiff was placed in a lineup in the presence of Gildea, Jaeger, and A.D.A. Kristin Fraser, and the lineup was presented to Wheeling. (Exh "27" Lineup Information Report p 4). Wheeling did not identify Ferguson and on page four where it is asked if he recognizes anyone from the lineup Wheeling responds "not really." (Exh "27").

Mr. Wheeling was subpoenaed to testify at the criminal trial. Before he testified, when shown the photo of Ferguson's mother's Ford Escape by the prosecutor, Wheeling told ADA Regan that it was not the vehicle he saw and that the shooter was either darker or lighter than Ferguson. (Exh "23" Regan dep at 13:14-14:25). Subsequently, the DA decided not to call Wheeling at trial. (Lichtmacher Declaration).

**Marcus Ortiz**

Gildea knew that a man named Marcus Ortiz[3] was a gang member who had been shot by

---

[3]    Mr. Ortiz was murdered himself on March 10, 2014 in South Lebanon Township. (Lichtmacher Declaration).

Keith Gulley. (Exh "10" Gildea at 95:16-96:2). Incredibly, defendant Gildea has testified, in sum and substance, that having been shot by someone is not necessarily a motive for murder. (Exh "10" at 96:19-98:2). Gildea did not interview Ortiz and never investigated whether or not he was the murderer. (96:11-15; 106:6-9). Gildea admitted that he never showed a photo of Marcus Ortiz to eyewitness Wheeling. (98:16-19). Yet Marcus Ortiz was identified as the shooter from a photograph shown to Mr. Wheeling by Investigator Elpidio De Leon (Exh "21").[4] At 5'10" tall, Ortiz was comparable in size to the perp described in the Preliminary Investigation Worksheet, generated hours after the incident which reported the perp was 5'9". (Exh "13" Prelim Inv Worksheet). Oritz' Mugshot lists him at 5'10". (Exh "14 Ortiz Musgshot). Additionally, Ortiz was much more lightly complected than Mr. Ferguson, which is in line with Mr. Evans initial description of a "light skinned" shooter. (Exh "14 Ortiz Mugshot; Exh "8" Jaeger's notes p 2). Mr. Ferguson is darkly complected and is over six feet tall. (Exh "15" Ferguson Mugshot).

**Reginald Evans**

Plaintiff casts no aspersions on Mr. Evans, who lost a brother and who was the victim of a violent crime. Plaintiff merely points out the change in his original description of the shooter, the distractions he admits to being subjected during the incident, and that Mr. Evans could not give the account of the incident without being "coached." Plaintiff asks the Court to consider the pressure tactics and lies engaged in by the defendants, documented above, when weighing Mr. Evans' testimony and what effect the defendants' ruthless tactics, in seeking a conviction at any

---

[4]    What is considered admissible and inadmissible Hearsay will be a pivotal issue in this matter.  The Magistrate Judge ruled that witness Orris Wheeling could take the Fifth Amendment well after he spoke extensively to Plaintiff's private investigator, retired First Grade Detective Elpidio De Leon

cost, may have had on him and his testimony. In light of the defendants' failure to coerce McCummings to testify falsely, and their similar failure with Mr. Wheeling, it is worth looking at the fact that Mr. Evans testimony changed and he identified Ferguson only after the defendants struck out with the other potential witnesses. McCummings was brought in on an unknown date in May and he would not help the defendants. On May 6, 2013 Logan-Smith showed officers the video and that did not help.  On May 7, 2013 Wheeling did not identify Ferguson in a lineup.  So by May 9, 2013 the defendants desperately needed a witness and Evans then changed his story and identified Ferguson in a lineup. (**Ex. L** (Evans Photo Array Documents); **Ex. B** (DD5 File) at D00430).

Evans' relevant trial testimony was that at one point he was looking at his children, three girls, at his brother, Keith Gulley, who he had not seen in three years, and simultaneously observing the street to keep an eye on passersby. (Exh "12" at D01658: 8-25; D01659:1-4.). He was not wearing his glasses at the time of the incident, although he testified he was able to see fairly clearly without them. (Exh "12" D01658:1-10). At trial, he contradicted his grand jury testimony, which was that the perpetrator wore khaki pants, at trial asserting that the pants were blue. (D01667:4-22). He testified that the shooting was chaotic and disorienting, that for much of the time his head was covered by his hands, and that his attention was turned to the safety of his young daughter. (D01683:7-22). His only opportunity to look at the perpetrator was in the moment when the murderer was upon the family, right before he began shooting, and that he had not been able to register any details of the man's appearance such as, facial hair or scars. (D01689:2-25; D01690:1-25, D01691:1-7). Immediately after the incident, he was unable to select the shooter from a six pack provided by investigators, or provide the details, such as "box

braids," which he provided to the grand jury. (D01695:3-25, D01696:5-10). Mr. Evans was never confronted at trial with the statement he made to Jaeger that the man was light skinned. (Lichtmacher Declaration).

**Wynter Carter**

Ms. Wynter Carter testified at trial the he saw the shooter wearing black clothing, and she observed the man was not wearing khaki pants. (D01948:6-17). Additionally she describes the man as chubby and built "up here" (D01948:18-24). When Mr. Ferguson was asked to stand up with Ms. Carter on the stand, she testified that her was not the person she saw and he was not of the build of the person she saw. (D01949:21-25).  Ferguson is decidedly thin. (Lichtmacher Declaration).

**Summary Judgment Standard**

"Summary judgment is proper only when, construing the evidence in the light most favorable to the non-movant, there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." (Olaizola v Foley, 797 F App'x 623, 624 [2d Cir 2020]) citing Doninger v. Niehoff, 642 F.3d 334, 344 (2d Cir. 2011).  In the instant matter there exists genuine issues of material fact, among other issues, as to whether the defendants hid relevant exculpatory evidence; consciously allowed relevant exculpatory evidence to be destroyed; intentionally failed to disclose an exonerating witness; and created documents which incorrectly reflected the evidence before them. It is indisputable that these issues, among others, are in controversy. With these factual issues unresolved summary judgment must be denied.

**Probable Cause**

Failure to disclose relevant exculpatory evidence as well as allowing such evidence to be

destroyed are alone the basis to void the probable cause, allowing a plaintiff to proceed for claims of malicious prosecution and denial of a fair trial:

> Under New York law, even when probable cause is present at the time of arrest, evidence could later surface which would eliminate that probable cause. . . . In order for probable cause to dissipate, the groundless nature of the charges must be made apparent by the discovery of some intervening fact.

Lowth v. Town of Cheektowaga, 82 F.3d 563, 571 (2d Cir. 1996)

The facts are clear that the defendants never actually had probable cause to arrest Mr. Ferguson, and that everything they point to as "probable cause" was manufactured. The gravity of the issues and the sheer discrepencies in the evidence weighs heavily in favor of a jury trial.

**Malicious Prosecution**

The elements of malicious prosecution under § 1983 are "substantially the same" as the elements under New York law, and "the analysis of the state and the federal claims is identical." Boyd v. City of N.Y., 336 F.3d 72, 75 (2d Cir. 2003)."To establish a malicious prosecution claim under New York law, a plaintiff must prove (1) the initiation or continuation of a criminal proceeding against plaintiff; (2) termination of the proceeding in plaintiff's favor; (3) lack of probable cause for commencing the proceeding; and (4) actual malice as a motivation for defendant's actions." (Coleman v City of NY, 688 F App'x 56, 57 [2d Cir 2017]) citing; Manganiello v. City of N.Y., 612 F.3d 149, 161 (2d Cir. 2010). Because a malicious prosecution claim brought under § 1983 is brought pursuant to the protections provided by the Fourth Amendment, plaintiffs must also establish in addition to the state tort requirements: a post-arraignment deprivation of liberty i.e., a constitutional "seizure." (Coleman v City of NY, 688 F App'x 56, 57-58 [2d Cir 2017]).  In the instant matter plaintiff was incarcerated for three

and three quarter years before prevailing. The constitutional deprivation is not in dispute.

It cannot be disputed that Gildea, Jaeger, and other members of the NYPD played an active role in the prosecution satisfying the first element. Briefly, Jaeger signed the Felony complaint and he and Gildea were the lead investigators and named Ferguson as the suspect. (Felony Complaint). The second element is satisfied via the acquittal of Mr. Ferguson on all the charges. At issue are elements (3) lack of probable cause for commencing the proceeding; and (4) actual malice as a motivation for defendant's actions.

Elements 3 and 4 in this matter are linked.  Actual malice can be inferred when a plaintiff is prosecuted without probable cause. (Rentas v Ruffin, 816 F3d 214, 221-222 [2d Cir 2016]); Manganiello v. City of New York, 612 F.3d 149, 163 (2d Cir. 2010); Boyd v. City of New York, 336 F.3d 72, 78 (2d Cir. 2003). Plaintiff presents substantial evidence of the suppression, destruction and alteration of evidence which could have prevented an indictment. There is evidence Gildea actively intimidated witnesses and added disturbing lies to police documents which were different than those provided by a witness. Jaeger's failure to memorialize in a DD5 and explore Evans' description of a light skinned man supports the malice element as well.  And the focus on Rashaun Ferguson with quite literally no evidence connecting him to the crime, and the subsequent manipilation of the investigation and dishonest DD5's presented to the DA support a finding of actual malice. Plaintiff has demonstrated, at the very least, a genuine issue of material fact as to probable cause, and because malice and probable cause are linked in these allegations, this cause of action must proceed to trial.

**Denial of a Fair Trial**

A person is denied the right to a fair trial when "an investigating official provides to the

-23-

prosecutor fabricated evidence that is likely to influence a jury's decision, and the plaintiff suffers

a deprivation of liberty as a result." Perez v. Duran, 962 F. Supp. 2d 533, 543 (S.D.N.Y. 2013)

(quoting Jovanovic v. City of N.Y., 486 F. App'x 149, 152 (2d Cir. 2012)

>    The Second Circuit has recognized Brady violations as actionable under 42 U.S.C. §
> 1983. Poventud v. City of New York, 750 F.3d 121, 132 n.12 (2d Cir. 2014) (en banc).
> "A classic Brady violation contains three elements: 'The evidence at issue must be
> favorable to the accused,  either because it is exculpatory, or because it is impeaching;
> that evidence must have been suppressed by the State, either willfully or inadvertently;
> and prejudice must have ensued.'" Fappiano v. City of New York, 640 F. App'x 115, 118
> (2d Cir. 2016) (quoting United States v. Rivas, 377 F.3d 195, 199 (2d Cir. 2004)).
> However, the Second Circuit has "never held that anything less than an intentional Brady
> violation establishes a [civil] § 1983 due process claim for damages." Id. at 118.

(Jeanty v City of Utica, 2021 US Dist LEXIS 7737, at *44-45 [NDNY Jan. 14, 2021, No.

6:16-cv-00966 (BKS/TWD)])

    A claim for denial of a fair trial accrue when the officer forwards false information to the

prosecutors." Garnett v. Undercover Officer C0039, No. 1:13-CV-7083 (GHW), 2015 U.S. Dist.

LEXIS 45232, 2015 WL 1539044, at *4 (S.D.N.Y. Apr. 6, 2015). The defendants in the instant

matter generated DD5's with intentionally inaccurate information, in particular the fraudulent

statements they added on behalf of Wheeling.  Equally malicious is their failure to generate

DD5's regarding the initial identification of the shooter as light skinned, the fraudulent reports of

a Ford Escape, and the intentional failure to document the viewing of the video and to have that

video and a key witness's name preserved.

    A fair trial violation may be based on an officer's intentional withholding of exculpatory

evidence. Ying Li v. City of New York, 15-CV-1599(PKC), 246 F.Supp.3d 578, 626-28

(E.D.N.Y. 2017). In the instant matter important evidence was withheld, exonerating information

was not memorialized, the key witness was hidden, and witnesses were coerced to lie.:

-24-

fair trial right protects against deprivation of liberty that results when a police officer fabricates and forwards evidence to a prosecutor that would be likely to influence a jury's decision, were that evidence presented to the jury. ('It is firmly established that a constitutional right exists not to be deprived of liberty on the basis of false evidence fabricated by a government officer.'). Frost v NY City Police Dept., 980 F3d 231, 250 [2d Cir 2020]) quoting Zahrey v. Coffey, 221 F.3d 342, 355 (2d Cir. 2000). These rights arise under the Fourth, Fifth, Sixth and the due process clause of the Fourteenth Amendments. Frost v NY City Police Dept.

**Qualified Immunity**

The Second Circuit has set forth the procedure by which the trial courts resolve disputes on factual issues at trial relevant to the qualified immunity analysis. In particular, "[i]f there are unresolved factual issues which prevent an early disposition of the defense [of qualified immunity], the jury should decide these issues on special interrogatories." Jones v Treubig, 963 F3d 214, 224-225 [2d Cir 2020]) citing Warren v. Dwyer, 906 F.2d 70, 76 (2d Cir. 1990); see also Stephenson v. Doe, 332 F.3d 68, 81 (2d Cir. 2003). The issues to be resolved in this matter are factual, not legal, as it is well established that it is unreasonable for officers to perform the acts alleged herein. Therefor qualified immunity in this matter is a jury issue.

**Conclusion**

Plaintiff presents an overwhelming case of defendants withholding, altering, failing to document and failing to report crucial evidence as well as extreme tactics used to coerce witnesses to lie. Plaintiff respectfully suggests, this case should be allowed to proceed to trial.

Dated: New York, New York
      May 17, 2021

_____/s/_____
Fred Lichtmacher

-25-
